UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                       CASE NO. 8:05-cr-475-T-27TGW

THOMAS F. SPELLISSY
_____/

**ORDER**

**BEFORE THE COURT** are Thomas Spellissy's fifth[1] Petition for a Writ of Error *Coram Nobis*, based on *McDonnell v. United States*, ___ U.S. ___, 136 S.Ct. 2355 (2016) (Dkt. 272), the United States' opposition (Dkt. 273), and Spellissy's reply (Dkt. 274). Upon consideration, his Petition for a Writ of Error *Coram Nobis* is DENIED.

**Historical Context**

In 2006, Spellissy was convicted of conspiracy to defraud the United States and to commit bribery and wire fraud, in violation of 18 U.S.C. § 371.[2] His conviction was affirmed. *United States*

---

[1] Defendant has filed more than fifteen (15) post trial motions seeking collateral relief directed to his conspiracy conviction, all of which have been denied. A recitation of Defendant's numerous filings is included in the order denying leave to file a fourth petition for writ of *coram nobis* (See Dkt. 259). Since then, he filed a § 2255 motion to vacate which was denied as successive (Dkts. 26, 263). He filed three prior petitions seeking *coram nobis* relief, two in his criminal case, and one in a separate civil action (*See* Dkts. 226, 246); *Spellissy v. United States*, 8:10-CV-661-T-33TBM (Dkt. 1). He was denied leave to file a fourth petition for writ of *coram nobis* (see Dkt. 259). The denials of his two prior *coram nobis* petitions were affirmed (Dkts. 237, 255). More recently, his request to file a second, successive § 2255 motion was denied by the Eleventh Circuit (Dkt. 267).

[2] Count One of the Indictment alleged a § 371 conspiracy between Spellissy and William Burke to defraud the United States. Burke was alleged to have been "assigned to the United States Special Operations Command Special Operations Acquisition and Logistics Center, management Directorate," and in that capacity, was "acting for and on behalf of the United States and the United States Department of Defense." (Dkt. 1, ¶5). And significantly, for purposes of Spellissy's claim of *McDonnell* error, the Indictment plainly alleged that he agreed to pay bribes to Burke in exchange for Burke taking specific action, that is, providing "preferential treatment to specific contractors represented by defendant Thomas F. Spellissy," and that Spellissy's payments to Burke were "for providing preferential treatment to certain projects."(Dkts. 1, ¶¶ 7 - 11).

1

*v. Spellissy*, 243 Fed. Appx. 550 (11th Cir. 2007).[3]

## Writ of *Coram Nobis*

One who, like Spellissy, has served his sentence and is no longer in custody may petition for a writ of error *coram nobis*. *United States v. Peter*, 310 F.3d 709, 712 (11th Cir. 2002). However, the writ is an extraordinary remedy of last resort, "available only in compelling circumstances where necessary to achieve justice." *See United States v. Spellissy*, 513 F. App'x 915, 916 (11th Cir. 2013), *quoting United States v. Mills*, 221 F.3d 1201, 1203 (11th Cir. 2000). "The bar for *coram nobis* is high, and a petitioner may only obtain such relief where: (1) 'there is and was no other available avenue of relief' and (2) 'when the error involves a matter of fact of the most fundamental character which has not been put in issue or passed upon and which renders the proceeding itself irregular and invalid.'" *Id., quoting Alikhani v. United States*, 200 F.3d 732, 734 (11th Cir. 2000); *United States v. Morgan*, 346 U.S. 502, 509 n.5 (1954) (Fundamental error must be shown, such that the underlying criminal proceedings are deemed "irregular and invalid."), *quoting United States v. Mayer*, 235 U.S. 55, 69 (1914); *Moody v. United States*, 874 F.2d 1575, 1576 (11th Cir. 1989).

Importantly, considering Spellissy's challenges to the Government's recitation of the trial evidence, the writ is not available to relitigate criminal convictions. *United States v. Addonizio*, 442 U.S. 178, 186 (1979).

---

[3] Some historical context is appropriate. In 2009, due to the number of post conviction motions, their cumulative nature, lack of merit, and disparaging content, an Order was entered requiring Defendant to obtain leave before filing any further pleading (CR Dkt. 195). He did not challenge that Order and has dutifully sought and obtained leave to file various pleadings, including a Joint Petition for Writ of Error *Coram Nobis*, a second "Petition for a Writ of *Error Coram* Nobis or in the Alternative, Motion for a New Trial Based on New Evidence or Vacate Judgment Based on Actual Innocence," an amendment to that petition, a Motion for Reconsideration of the denial of that motion, and a motion to vacate, although that motion was dismissed as successive (*See* Dkts. 210, 226, 241, 245, 250; 262 - 263). He was granted leave to file the instant petition (Dkt. 271).

2

## Discussion

According to Spellissy, "[t]he basis of this petition for writ of *coram nobis* is that the United States Supreme Court's recent decision in *McDonnell* establishes that the conduct of which Defendant was convicted in Count One does not constitute a crime." (Dkt. 272 at 2-3).[4] He contends that in light of *McDonnell*, he "was convicted of conduct that was later ruled non-criminal and therefore he is entitled to *coram nobis* relief." (*Id.* at 6).[5] He is mistaken.

**Availability of writ of *coram nobis***

Addressing *coram nobis* relief, the Supreme Court has observed that "it is difficult to conceive of a situation in a federal criminal case today where that remedy would be necessary or appropriate." *Carlisle v. United States*, 517 U.S. 416, 429 (1996) (quoting *United States v. Smith*, 331 U.S. 469, 476 n.4 (1947)). As noted, the bar for *coram nobis* relief is high, and the writ is available "only when there is and *was* no other available avenue of relief." *Alikhani*, 200 F.3d at 734 (emphasis added). The writ is not available to raise issues which could have been raised on appeal. *Id.* at 735.

To the extent, therefore, Spellissy asserts error in the jury instructions, he offers no reason for not having raised this claim on direct appeal or in his prior post conviction motions. *Mills*, 221

---

[4] *McDonnell v. United States*, 136 S.Ct. 2355 (2016). In *McDonnell*, the Court found error in a jury instruction defining "official act" and vacated Governor McDonnell's convictions for conspiracy to commit honest services fraud, honest services wire fraud, conspiracy to commit Hobbs Act extortion, and Hobbs Act extortion.

[5] In *Teague v. Lane*, 489 U.S. 288 (1989), the Supreme Court held that a case decided after a petitioner's conviction and sentence became final generally may not be the basis for vacating that conviction. *See United States v. Swindall*, 107 F.3d 831, 834 (11th Cir. 1997). The Government does not raise a *Teague*-bar defense, likely because *Teague* applies only to new procedural rules. *Bousley v. United States*, 523 U.S. 614, 620 (1998) ("And because *Teague* by its terms applies only to procedural rules, we think it is inapplicable to the situation in which this Court decides the meaning of a criminal statute enacted by Congress.").

F.3d at 1204 ("[C]ourts may consider coram nobis petitions only where no other remedy is available and the petitioner presents sound reasons for failing to seek relief earlier.").

Notwithstanding, *coram nobis* relief is available "to correct errors 'of the most fundamental character; that is, such as rendered the proceeding itself irregular and invalid.'" *United States v. Peter*, 310 F.3d 709, 712 (11th Cir. 2002), *quoting Morgan*, 346 U.S. at 509 n. 15. One such error is jurisdictional error, based on a retroactively applied Supreme Court decision which construes a substantive federal criminal statute. *Peter*, 310 F.3d at 711, 715 ("Indeed, jurisdictional error is by its nature of such a 'fundamental character' as to render proceedings 'irregular and invalid' . . . and coram nobis relief affords a procedural vehicle through which such error may be corrected.").

**No fundamental error rendering proceedings invalid**

Supreme Court precedent, including *McDonnell,* instructs that a conviction is flawed if a jury is instructed on alternative theories of guilt and returns a verdict that may rest on a legally invalid theory. *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008); *Yates v. United States*, 354 U.S. 298, (1957) (constitutional error occurs when jury instructed on alternative theories of guilt and returns general verdict that may rest on a legally invalid theory); *Skilling v. United States*, 561 U.S. 358, 414 (2010).

This is not Spellissy's first *coram nobis* petition in which he contends that one of the alternative objects of the conspiracy charged in Count One was subsequently determined to be non-criminal. The Eleventh Circuit rejected his earlier contention that his conviction was constitutionally flawed because the jury's verdict may have rested on a theory of honest services fraud involving only a conflict of interest or self dealing, liability theories foreclosed by *Skilling v. United States*:

4

> First, [his] conviction[] [was]not based on the same "conflict of interest" or "self-dealing" theories of liability foreclosed by *Skilling*. Specifically, with regard to the conspiracy charge, the jury was instructed that the conspiracy alleged two objects, bribery and wire fraud; only one had to be unanimously agreed upon by the jury to convict; and the conspiracy deprived the government of honest services if it involved a scheme to cheat the public, such as by accepting a bribe. Therefore, the instructions were not predicated on the theories of liability foreclosed by *Skilling*.

*Spellissy*, 438 F. App'x at 783.

Similarly, Spellissy's contention that the jury's verdict could have been based on conduct found to be non-criminal in *McDonnell* does not support a finding of "fundamental error" which renders the proceedings invalid.

**Jury instruction on "official action" and *McDonnell***

In his petition, Spellissy focuses on the jury instruction defining "official act," contending that "the conduct for which the Defendant was convicted does not constitute a criminal offense under conspiracy to commit honest-services fraud and/or bribery . . ," relying on *McDonnell*.

Spellissy contends that the jury instruction in his trial defining "official act" was error under *McDonnell*. The jury was instructed, consistent with 18 U.S.C. § 201(a)(3):

> The term "official act" means any decision or action on any question, matter, cause, suit, proceeding or controversy which is brought before a public official for a decision or to be acted upon.

(Dkt. 58 at 15).

In *McDonnell*, the Supreme Court found error in a similar instruction premised on the same statutory language, finding that it was "overinclusive" in the context of that case. The question, therefore, is whether in light of *McDonnell,* the jury instruction in Spellissy's case defining "official action" was error, and if so, whether it was harmless.

5

Decisions of the Supreme Court which construe substantive federal criminal statutes, like *McDonnell*, are given retroactive effect. *Peter*, 310 F.3d at 711, *citing Bousley v. United States*, 523 U.S. 614, 620-21 (1998). In light of *McDonnell*, the jury instruction used in Spellissy's trial defining "official act" is arguably incomplete and therefore erroneous. Notwithstanding, as will be discussed, I find that any error was harmless. For purposes of *coram nobis* relief, Spellissy has not demonstrated error of the most fundamental character that rendered the proceedings irregular and invalid. In sum, unlike *McDonnell*, there is no likelihood that Spellissy was convicted for conduct that is not unlawful.

***McDonnell* error subject to harmless error analysis**

Although a conviction is flawed when a jury is instructed on alternative theories of guilt and its verdict may rest on a legally invalid theory, the error is subject to harmless error analysis. *See United States v. Spellissy*, 438 F. App'x 780, 783 (11th Cir. 2011); *Skilling*, 561 U.S. at 414 (*Yates* error subject to harmless-error analysis). As the Eleventh Circuit reasoned in Spellissy's last attempt to obtain coram nobis relief:

> Second, even if a constitutional, or *Yates*-style error occurred under *Skilling*, it was harmless. As the record shows, the charged activity, the arguments made in closing, the instructions to the jury, and the post-verdict arguments, all point to the fact that the proscribed activity, for which Spellissy and SDI were charged, put on trial, and convicted, involved a scheme by Spellissy and SDI to pay Burke for preferential treatment in procuring contracts. This remains proscribed activity, even after *Skilling* narrowed "honest-services fraud" to include only bribe or kickback schemes. Therefore, any *Yates* error at trial was harmless, because it likely did not have a "substantial and injurious effect" on the jury's verdict, since the information and instructions presented to the jury were premised on a bribery or kickback scheme.

*Spellissy*, 438 F. App'x at 783–84.

**The evidence**

As the Government correctly notes, "the evidence and argument in this case focused entirely on the awarding to Spellissy's clients of specific government contracts that were up for bid-in other words, specific matters that were pending before the DOD." In its response to Spellissy's petition, the Government painstakingly, and accurately, summarizes the testimony and exhibits it introduced to prove the conspiracy charged in Count One (Dkt. 273 at 10-18).[6]

At trial, Burke was the Government's primary witness called to prove that Spellissy had bribed Burke. Burke pleaded guilty pursuant to a written plea agreement which included a cooperation clause (Gov't Exh. 41). Although it was undisputed that Spellissy's company made payments to Burke during the time they were exchanging e-mails about Burke using his influence to advance the interests of Spellissy's clients, Burke "went south" on the Government and disavowed his plea agreement. To the surprise of the prosecutor, he testified, without contradiction, that the payments were for legitimate work he performed for Spellissy on an hourly basis. And notwithstanding his admissions in his plea agreement, he denied any criminal culpability or having conspired with Spellissy. The jury was apparently not impressed with Burke's testimony, however, and convicted Spellissy of the two substantive counts of bribery.

Notwithstanding, judgments of acquittal were granted based on Burke's uncontradicted testimony that the payments were legitimate, and the absence of any contrary evidence (Dkt. 72). Although Spellissy makes much of his judgment of acquittal on the substantive bribery counts

---

[6] As noted, the writ of *coram nobis* is not available to relitigate criminal convictions. *Addonizio*, 442 U.S. at 186. For example, Spellissy's contention that "the evidence at trial did not prove this scheme" is a misguided attempt to relitigate the case, as is his quarrel with the Government's perspective of the evidence (Dkt. 272).

(Counts Two and Three) (Dkt. 72), that does not diminish the significance of the bribery scheme alleged to have been an object of the § 371 conspiracy.[7]

Notwithstanding Burke's testimony, there was certainly more than sufficient evidence demonstrating that Spellissy and Burke discussed, planned and agreed to implement a bribe scheme to advance the interests of Spellissy's clients using Burke's influence in the DOD decision making process, and that they used interstate wire in the form of e-mails to accomplish that. And the evidence demonstrated that Burke was in a position to influence the decision-making process as a contract employee and team leader in the Comparative Testing Office at SOCOM.

The Comparative Testing Office at SOCOM administers two programs, the Foreign Comparative Testing program ("FCT"), and the Defense Acquisition Challenge ("DAC") program. (Dkt. 109 at 335, 340). The FCT program is managed by the DOD and administered by the military, including SOCOM, to identify and test foreign items for military use (Dkt. 109 at 340). The DAC program evaluates products manufactured in the United States for use by the military (Id. at 341).

Before a product can be evaluated by the FCT or DAC programs, it must meet certain guidelines and criteria and be approved by the program manager (Id. at 342). The Comparative

---

[7] The jury convicted Spellissy of bribery as charged in Counts Two and Three (Dkt. 62). Judgment of acquittal on both counts was entered post-trial (Dkt. 72). Notwithstanding, Spellissy could be convicted of conspiring with Burke to commit bribery and wire fraud, without any bribes having been paid, since a conspiracy charge is a separate and distinct offense from the substantive offenses which are the objects of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 643 (1946) ("It has been long and consistently recognized by the Court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses."). Indeed, one may be guilty of having conspired to commit a substantive offense without having actually committed the substantive offense. *United States v. Gornto*, 792 F.2d 1028, 1035 (11th Cir. 1986) (defendant can be convicted of conspiracy but acquitted of the substantive crimes), *overruling on other grounds recognized in United States v. Shenberg*, 89 F.3d 1461, 1480 (11th Cir.1996). And "[w]hether the object of a conspiracy is achieved is immaterial to the commission of the crime of conspiracy." *Id., citing United States v. Nicoll*, 664 F.2d 1308 (5th Cir., Unit B, 1982).

Testing Office annually prepares draft proposals for domestically manufactured products and solicits proposals (Id. at 343-44; Dkt. 111 at 657-58). The PEO, program managers, and comparative testing team finalize and prioritize proposals and submit them for DOD's consideration (Dkt. 111 at 659-60). The Office of the Secretary of Defense ("OSD") then evaluates and prioritizes the proposals for funding and selects which to fund for testing (Id. at 660-61); Govt's Exh. 42).

According to James Pettigrew, a division chief who worked for the Acquisition and Logistics Center within U.S. Special Operations Command, Burke "was the Comparative Test Office Central lead employee or supervisor" (Dkt. 111 at 664). Burke's responsibility as a team leader was to administer the FCT and DAC programs (Dkt. 109 at 345; Dkt. 111 at 665). He was involved in "market analysis" and "market surveys," examined potential foreign vendors, assisted in preparing request letters to the PEOs regarding FCT proposals, assisted in drafting proposals, and ensured that proposals met the OSD guideline (Dkt. 111 at 665-66). And he assisted in the analysis of the merits of proposals and worked with the PEOs to prioritize proposals that would be submitted for approval. (Id. at 667-69). A proposal's priority on the list submitted to the DOD determined the likelihood that the proposal would be funded (Id. at 669). If a proposal did not make the list, it was not considered for funding (Id.). And if Burke determined that a proposal did not meet the guidelines, it would be rejected or revised to meet the guidelines (Id. at 670).

After Spellissy incorporated SDI, he and Burke exchanged e-mails demonstrating their agreement that Burke would use his position in the Comparative Testing Office to influence consideration of SDI client's proposals. For example, in a September 12, 2004 e-mail, Burke told Spellissy "[I]f we get Multi-target and 70mm FCT proposals approved for FY05, we should be

9

compensated for these efforts-agree?" "I will be in DC Sunday -Tuesday to get FCT approvals for 05."(Gov't Exh. 8).

The next month, Spellissy sent Burke a list of "Priorities for CBE-as of Oct 04[.]," identifying companies desiring to do business with the DOD, including Source of Sound, Rabintex, Lamination Technologies, Versa Hitch, Exsensor, UIS Ammo, Nordic Ammunition Company, NICO Pending and Saab Defense Systems, and two others he had been "approached by." (Gov't Exh. 9; Dkt. 110 at 391-94, 397, 399, 400-02). Burke's response commented on the projects he was attempting to influence, and alluded to not having received consideration for his "efforts," that there should "be some 'regular' type of consideration provided now to those who have worked so hard for them over the last few years[.]" (Gov't Exh. 10). Burke told Spellissy:

> At this point, in the near term, and for the present moment, I can certainly influence approval of FCT and DAC RDT&E projects. I did work my butt off to obtain approval of these four projects, and it appears to me, there should be some consideration for this effort for these vendors up to this point. . . .
> ... If they don't want to show "appreciation", the spigot off [sic] on future FCT and DAC or other projects can always be turned off–no problem.

(Id.)

Spellissy responded: "Bill, in the long run, we really control the outcome . . .My loyalty and all I care about is you and Deac-the three of us will win in the end . . . I am trying to take care of you and him without anyone knowing it . . . (Gov't Exh. 11).

Burke, indicating "For your Eyes Only," in his e-mail, complained to Spellissy that "after all the support we provided to these guys for the last 5 years on numerous projects, they would really 'owe' something-there are no 'free lunches.' I thought they would jump all over establishing a relationship with SDI. It is the door to SOCO FCT and SOCOM SP. As you said, we are in control."

10

(Gov't Exh. 12). He added: "Just so you know, Banks has 2-3 small DAC proposals working now. Those projects might just slide to the botto[m] of the list." (Id.). Spellissy responded: "I am not finished on the Banks. What are the three DACs? If they approach me about them-I'll make them pay." (Gov't Exh. 13). And when Spellissy instructed Burke to "[p]ut them low or kill them and if anyone asks, they have already been plussed up and the command has other priorities," Burke responded: "Got it." (Gov't Exhs. 15). Burke continued to complain that several projects he had worked on had been approved for funding, but that the vendors had not shown their "love/gratitude now." (Gov't Exh. 36).

Based on this evidence, it cannot be reasonably disputed that the DOD approval process, including the review, finalization, and prioritizing of proposals by the Comparative Testing Office, constitutes a "question, matter, cause, suit, proceeding or controversy" as defined in 18 U.S.C. § 201(a)(3). *Id.* at 2372 ("The 'question, matter, cause, suit, proceeding or controversy' must involve a formal exercise of governmental power that is similar in nature to . . . a determination before an agency . . .[and] . . . something specific and focused that is 'pending' . . .").

Nor can it be reasonably disputed that Burke was engaged in "official action" when reviewing and prioritizing proposals to be submitted to the DOD. It is not required that he actually made a decision or took action on a "question, matter, cause, suit, proceeding or controversy," *only that he agreed to do so. Id.* at 2371-72 (emphasis added) ("To qualify as an 'official act,' the public official must make a decision or take an action on that 'question, matter, cause, suit, proceeding or controversy,' or agree to do so [and] [t]hat decision or action may include using his official position to exert pressure on another official to perform an 'official act,' or to advise another official,

11

knowing or intending that such advice will form the basis for an 'official act' by another official.").

In sum, the evidence proved beyond a reasonable doubt the conspiracy charged in Count One, which plainly charged Spellissy with conspiring to pay Burke bribes, in exchange for which Burke agreed to provide preferential treatment for Spellissy's clients. (Dkt. 1 at 3, ¶¶ 9, 10) ("It was further a part of the conspiracy that William E. Burke would and did provide preferential treatment to specific contractors represented by THOMAS F. SPELLISSY . . . It was further a part of the conspiracy that defendant THOMAS F. SPELLISSY would and did provide illegal payments to William E. Burke for providing preferential treatment to certain projects.").

**Harmless error**

In *McDonnell*, the evidence relied on by the Government as "official acts" included (then) Governor McDonnell arranging meetings, contacting other officials, and hosting events. *Id.* at 2374. Noting that "[t]o qualify as an 'official act,' the public official must make a decision or take an action on that 'question, matter, cause, suit, proceeding or controversy,' or agree to do so," the Court concluded that without more, setting up meetings, contacting other officials and hosting events "does not fit that definition of 'official act.'" *Id.* at 2372. As a result, the jury instruction defining "official action" "lacked important qualifications, rendering them significantly overinclusive." *Id.* at 2374. The Court reasoned that the jury "may have convicted Governor McDonnell for conduct that is not unlawful."*Id* at 2375. The error, therefore, was not harmless, and McDonnell's conviction was vacated.

Here, unlike *McDonnell,* the Government did not rely on ostensibly innocent conduct on

12

Burke's part as "official acts."[8] Rather, it relied exclusively on his participation in the review and prioritizing of specific proposals pending before the Comparative Testing Office, and his agreement to influence that process in exchange for bribes from Spellissy. His "official actions," therefore, fell squarely within *McDonnell's* limited construction of the term. Unlike the jury in *McDonnell*, Spellissy's jury could not have found him guilty of conduct which did not constitute a crime. Any error in the jury instruction defining "official action" was therefore harmless.[9]

**No jurisdictional error**

Spellissy's reliance on *United States v. Peter* is misplaced. In *Peter*, the defendant pleaded guilty to a Superseding Information charging him with conspiring to violate the Racketeer Influenced and Corrupt Organizations Act (RICO). The only predicate act in his plea agreement which supported the RICO conspiracy was mail fraud, based on his admission that he made misrepresentations in license applications he mailed to the Florida Division of Alcoholic Beverages and Tobacco. Subsequent to his conviction, *Cleveland v. United States*, 531 U.S. 12, 15 (2000), was decided, which "held that state-issued licenses are not 'property' for purposes of mail fraud under §1341." *Peter*, 310 F.3d at 715.

As a result of *Cleveland*, the Eleventh Circuit reversed the denial of *coram nobis* relief, finding that "the facts to which Peter pled guilty did not constitute a crime under *Cleveland*." *Id.* at 711. Noting that the Superseding Information charged Peter only with making misrepresentations

---

[8] Unlike the Indictment in *McDonnell*, which alleged, among other things, that Governor McDonnell committed an "official act" by "arranging meetings," "hosting and...attending events," and "contacting other government officials," Spellissy's Indictment expressly alleged that Burke would and did provide preferential treatment to specific contractors represented by defendant THOMAS F. SPELLISSY (Dkt. 1 at 4, ¶ 10).

[9] And there is no "cumulative error," as Spellissy urges.

13

in license applications mailed to a state agency, the very conduct *Cleveland* determined to be non-criminal, the Court held that the district court lacked jurisdiction because the Superseding Information alleged a "non-offense." *Id.* at 715 ("The district court had no jurisdiction to accept a plea to conduct that does not constitute mail fraud . . ."). The Court observed that "jurisdictional" error constituted error of a "fundamental character," warranting *coram nobis* relief. *Id.* at 715-16.

"Subject-matter jurisdiction defines the court's authority to hear a given type of case...." *Alikhani*, 200 F.3d at 734, quoting *United States v. Morton*, 467 U.S. 822, 828 (1984); 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."). It follows that "an indictment charging that a defendant violated a law of the United States gives the district court jurisdiction over the case." *McCoy v. United States*, 266 F.3d 1245, 1252 (11th Cir. 2001); *Alikhani*, 200 F.3d at 734-35; *United States v. Keane*, 852 F.2d 199, 205 (7th Cir. 1988) ("[I]f the indictment states an offense, that is the end of things for relief in the nature of coram nobis."), *cert. denied*, 490 U.S. 1084 (1989).

Spellissy's conviction does not suffer the same jurisdictional defect as did the conviction in *Peter*. Unlike the Superseding Information in *Peter*, Count One of Spellissy's Indictment unquestionably charged a § 371 conspiracy (Dkt. 1). There is, therefore, no jurisdictional error.

**Finality**

One final note. This Order should close the book on Spellissy's conviction. There must be finality to a criminal proceeding. *See Kennedy v. Sanford*, 166 F.2d 568, 569 (5th Cir.1948) ("Criminal trials still have some finality."); *Gunn v. Newsome*, 881 F.2d 949, 955 (11th Cir. 1989) ("the important need for finality in criminal law counsels strongly against courts repeatedly

14

reviewing criminal convictions.") (citation omitted). And significantly, "judgment finality is not to be lightly cast aside; and courts must be cautious so that the extraordinary remedy of coram nobis issues only in extreme cases." *United States v. Denedo*, 556 U.S. 904, 916 (2009). Unfortunately for Mr. Spellissy, this is not such a case.

Accordingly, Thomas F. Spellissy's Petition for Writ of Coram Nobis (Dkt. 272) is **DENIED**.

**DONE AND ORDERED** in on this 22nd day of February, 2017.

_____
JAMES D. WHITTEMORE
United States District Judge

Copy to: Petitioner *pro se,* Counsel of Record